UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GEORGE WILLIAM QUINN,

    Plaintiff,

    vs.                                      No. 3:14cv724(WIG)

CAROLYN COLVIN,
Acting Commissioner of
Social Security,

    Defendant.

_____X

## RECOMMENDED RULING ON PENDING MOTIONS

Plaintiff George Quinn has filed this appeal of the adverse decision of the Commissioner of Social Security denying his applications for a period of disability and disability insurance benefits. Plaintiff now moves, pursuant to 42 U.S.C. § 405(g), for an order reversing the Commissioner's decision. [Doc. # 13]. Defendant has responded with a motion to affirm the decision of the Commissioner. [Doc. # 16]. For the reasons set forth below, the Court recommends that the decision of the Commissioner should be reversed and the matter remanded for further proceedings consistent with this Ruling.

## Procedural History

Plaintiff filed his application for disability insurance benefits on July 19, 2011, alleging a disability onset date of July 18, 2011. His claim was denied initially (on September 12, 2011), and upon reconsideration (on October 20, 2011). Plaintiff then filed a request for a hearing; a hearing was held before administrative law judge William J. Dolan (the "ALJ") on December 19, 2012. Two days later, the ALJ issued a decision finding that Plaintiff had not been disabled from

the alleged onset date through the date of the ALJ's decision. Plaintiff appealed to the Appeals Council. In a decision dated March 31, 2014, the Appeals Council denied the appeal and upheld the ALJ's decision, making the ALJ's decision final for appeals purposes. This appeal ensued.

## Factual Background

Plaintiff was 55 years old on the alleged disability onset date. (R. 24). Plaintiff has a high school diploma. (R. 33). After high school, he completed six months of vocational school studying computer operations. (*Id.*). Plaintiff was last employed by Bank of America where he worked as a systems analyst. (R. 34). He held this position from February 2007 until he was laid off in July 2011. (*Id.*). In addition to this job, Plaintiff has prior experience working as a computer programmer and being self-employed doing contract work. (*Id.*).

## Medical History

Plaintiff began treatment while he was living in Virginia. On January 27, 2010, Dr. Primavera, Ph.D., conducted a psychiatric diagnostic interview examination of Plaintiff in conjunction with treatment and medication management Plaintiff was receiving from psychiatrist Dr. Pushkin. (R. 280). Plaintiff reported a history of depression, past suicidal ideation, and a four-day hospitalization a year earlier when he stopped taking his medication and had a "meltdown." (R. 281). Dr. Primavera recorded that Plaintiff "likes having maintenance therapy as a safety net – he is aware of triggers such as fear of losing his job and would like to increase his security." (*Id.*). Dr. Primavera diagnosed Major Depressive Disorder, recurrent, in partial remission (principal) and Generalized Anxiety Disorder (by history). (R. 282). A GAF score of 65 was assessed.[1] (*Id.*). At the time of the diagnostic interview, Plaintiff was taking the

---

[1] GAF scores are representative of a patient's overall level of functioning. *See Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, American Psychiatric Association, 1994 p. 34. A GAF score of 21- 30 is indicative of behavior that is considerably influenced by delusions or hallucinations, or serious impairments in communication or judgment.

following medications: Wellbutrin, Ambien, Lipoflaviniods, Hydrocodone, Lipitor, and Protorix. (R. 281).

Dr. Pushkin conducted a psychiatric diagnostic interview examination of Plaintiff on February 5, 2010. (R. 257). He diagnosed Generalized Anxiety Disorder (principal); Dysthymia, early onset; Major Depressive Disorder, single episode, unspecified, chronic; and Pervasive Developmental Disorder, not otherwise specified (rule out). (R. 258). Dr. Pushkin observed Plaintiff as well-oriented, alert, with an anxious affect and euthymic mood. (*Id.*). He also noted that Plaintiff averted eye contact, was cooperative, and was interested. (*Id.*). A medication plan was developed and Plaintiff was instructed to follow up in three weeks. (R. 259).

Medical records show that Plaintiff continued treatment with Dr. Pushkin until May 2011. Several progress notes indicate that medication was helpful in controlling Plaintiff's symptoms. (R. 263, 265, 267). On November 17, 2010, Plaintiff reported he was experiencing some adjustment-related anxiety and personality decomposition relating to concerns over his job. (R. 270). On November 22, 2010, Dr. Primavera emailed Dr. Pushkin to report that Plaintiff had written her emails describing various stages of suicide ideation. (R. 295). She relayed that Plaintiff expressed he decided against suicide when his wife told him she would love him even if he lost his job. (*Id.*). Dr. Pushkin responded that Plaintiff is "primitively decomped at the moment," and opined that seeing Plaintiff more often in supportive reality based therapy would

---

*Id.* A GAF score of 31- 40 is indicative of some impairment in reality testing or communication, or major impairments in several areas. *Id.* A GAF score of 41- 50 is indicative of serious symptoms or serious difficulty in social, occupational, or school functioning. *Id.* A GAF score of 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See id.* A score of 61- 70 is indicative of some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, and having some meaningful interpersonal relationships. *See id.*

be beneficial. (R. 297). Dr. Pushkin observed Plaintiff to be back to baseline and with no gross distress on December 1, 2010. (R. 271). Plaintiff denied any active lethality on that date. (*Id.*).

On January 1, 2011, Plaintiff reported to Dr. Pushkin that he was engaging in therapy to understand more about himself. (R. 275). Over the next several months, Plaintiff continued with his medication plan, with adjustments made as needed. (R. 276-277). On April 25, 2011, Plaintiff's mood was somewhat affected with adjustment-related symptoms, but not vegetative in nature. (R. 276). On May 10, 2011, Dr. Pushkin discussed with Plaintiff concerns about Plaintiff's sexual acting out; Dr. Pushkin suggested therapy to address this matter. (R. 278). Dr. Pushkin assessed a history of Major Depressive Disorder, single episode, rule out sexual disorder and personality disorder. (*Id.*). On May 24, 2011, Plaintiff reported that his history of compulsive sexual behavior despite consequences arises out of boredom. (R. 279). Dr. Pushkin observed that the behavior does not appear to be mood or substance driven. (*Id.*). He further observed that Plaintiff has a new therapist, Dr. Creekmore, who believes he may suffer from bipolar disorder and dissociative disorder, and that his history does not reflect manic or dissociative symptomology per se. (*Id.*). Dr. Pushkin relayed to Plaintiff that he did not concur with Dr. Creekmore's diagnoses. (*Id.*).

Plaintiff began to see Dr. Creekmore, Psy.D., in May 2011. Dr. Creekmore prepared a summary of her office notes, consisting of initial clinical evaluations and treatment, on August 9, 2011.[2] (R. 361). She had seen Plaintiff in 18 sessions, and had diagnosed him with Bipolar I Disorder and Dissociate Identity Disorder (with alters that emerge in therapy). (*Id.*). She reported that Plaintiff had previously been misdiagnosed as just anxious and depressed. (*Id.*).

---

[2] Dr. Creekmore wrote that she was submitting treatment summaries in lieu of sending illegible, "doctorese" handwritten notes. (R. 409).

4

She described him as cooperative with treatment. (*Id.*). She noted that his current medications were appropriate, and that Plaintiff was learning to manage his system of alters. (R. 361-362).

Dr. Creekmore prepared another summary of her office notes on January 15, 2012. She reported that Plaintiff has an erratic, troubled history, including an alcoholic father, a learning disability, and sexual abuse in childhood. (R. 378). She opined that past treatment for only anxiety and depression was not sufficient, and that since starting treatment with her, Plaintiff has made improvements in reducing his acting out and in increasing his sense of positive wellbeing. (*Id.*).

A third summary was prepared by Dr. Creekmore on December 2, 2012. She reported that therapy included referring Plaintiff for appropriate mood stabilization medication, monitoring this medication, and treatment with personality alters. (R. 409). She observed that treatment for Plaintiff's conditions was just underway when he moved to Connecticut. (*Id.*). Finally, she opined that Plaintiff cannot function to work, is in need of disability benefits, and requires continued, intensive therapy with supportive family therapy. (*Id.*).

Upon moving to Connecticut, Plaintiff began treatment with Dr. Hanson, LMFT, Psy.D. In a letter dated April 20, 2012, Dr. Hanson reported that she had been seeing Plaintiff for individual therapy twice per week since February 16, 2012. (R. 396). She observed that he appeared effectively medicated for Bipolar Disorder, and that her work with him focused on the diagnosis of Post-Traumatic Stress Disorder. (*Id.*). Treatment goals included strengthening interpersonal relationships, increasing coping skills, and working through traumatic history as it related to disassociation, mood instability, and his previous decompensation. (*Id.*). She noted that since Plaintiff's move to Connecticut he has been less overwhelmed, more capable of managing his moods, and less dissociated. (*Id.*). Dr. Hanson noted that Plaintiff had begun

doing volunteer work at an animal shelter where he can connect with animals without the demand or judgment experienced in the work environment. (*Id.*). Finally, she opined that Plaintiff continues to be vulnerable to stress and is at risk to decompensate if pushed beyond his current capacity. (*Id.*).

Dr. Hanson prepared a second letter on October 25, 2012, updating Plaintiff's treatment progress since April 20, 2012. (R. 408). She reported that Plaintiff continues to comply with his medication plan, and continues his volunteer work at the animal shelter. (*Id.*). She explained that treatment included exploring childhood events that make Plaintiff vulnerable to being overwhelmed, disassociating, and having post-traumatic reactions to particular situations. (*Id.*). She opined that while Plaintiff has made slow and continuous progress, he remains vulnerable to rage, feelings of hopelessness and despair, and is at risk of decompensating if demands or stresses exceed his capacity to manage. (*Id.*). Finally, Dr. Hanson observed that the stressors in Plaintiff's life are dramatically reduced without the demand and criticism that derailed him in the work environment.[3] (*Id.*).

Plaintiff also sought treatment with the University of Connecticut's Psychiatry Outpatient Services ("UCONN") for medication management and psychotherapy. Dr. Winokur conducted an initial evaluation on February 14, 2012. (R. 404). He reported Plaintiff's diagnosis of Dissociative Identity Disorder, observing that, upon questioning, Plaintiff denied any periods of lapsed memory or of not being aware of his actions even when under a different persona. (*Id.*). Dr. Winokur stated Plaintiff's mood was good and his affect was odd but generally euthymic and appropriate. (R. 406). His thought process was mostly linear and goal oriented. (*Id.*). A GAF score of 55 was assessed. (*Id.*). Dr. Winokur recommended continuing Plaintiff's present

---

[3] Dr. Hanson submitted her initial assessment and her clinical notes along with these two letters.

medications. (*Id.*). Plaintiff continued to see an advanced practice registered nurse at UCONN for medication management. (R. 400-402). Plaintiff's treatment plan at UCONN lists as a goal that Plaintiff will "reconcile and integrate different dissociated aspects of self into a unitary notion of self." (R. 401). The plan also noted that Plaintiff was currently stable on psychiatric medications and in therapy, but that he would likely need long term services and follow up. (R. 401).

## Agency Documents

Plaintiff completed an Activities of Daily Living ("ADL") function report on August 9, 2011. Plaintiff reported the following: he cares for his wife and dog. (R. 197). He has difficulties sleeping, but no problems with personal care. (*Id.*). Plaintiff prepares his own meals and does house and yard work. (R. 198). He spends time talking to friends on the computer and doing volunteer work. (*Id.*). Plaintiff has difficulty getting along with some members of his wife's family because they do not understand his illness. (R. 201). He does not handle stress well. (R. 202). He is currently unemployed due to numerous conflicts with his former boss, and he has had legal problems with police due to risky and compulsive behaviors. (R. 203).

An ADL function report was also completed by Plaintiff's wife on August 9, 2011. She reported as follows: Plaintiff helps care for her and their dog. (R. 221). He also helps care for others by seeing a friend who is divorced and needs someone with whom to talk. (*Id.*). Plaintiff's addictive and compulsive behaviors get worse with his illness. (R. 225). He does not handle stress well, and can handle changes with advanced notice. (R. 228).

A Mental Status Evaluation Form was completed by Dr. Creekmore on August 9, 2011. (R. 356). With respect to Plaintiff's social history, she noted his relationship with his wife is "ok," he has few friends, and has difficulties with bosses. (*Id.*). She also noted Plaintiff had

been arrested for "acting out" behaviors. (*Id.*). Regarding daily activities and interests, Dr. Creekmore reported that Plaintiff can manage daily living activities although his wife does most of the bill paying and cooking. (R. 357). In opining on Plaintiff's current mental status, Dr. Creekmore reported that Plaintiff was depressed and withdrawn, was recently suicidal, has large gaps in his memories of early childhood, has had delusions, has chaotic thoughts and confusion, and was oriented and cooperative. (R. 358).

Dr. Niemeier, Ph.D., a state agency psychologist, reviewed Plaintiff's claim at the initial level in September 2011. He opined that the ADLs show Plaintiff has problems relating to authority, but that he has been able to work in the past despite symptoms from his mental disorder. (R. 51). Dr. Niemeier found no evidence to support the Dissociative Identity Disorder diagnosis. (R. 52). Dr. Niemeier further opined that Plaintiff could do simple work that has minimal interpersonal contact. (*Id.*).

Dr. Luck, Ph.D., a state agency psychologist, reviewed Plaintiff's claim at the reconsideration level in October 2011. He observed that Plaintiff had been getting therapy for his mental health issues since 2007 and had managed to work a full-time skilled job throughout. (R. 65). He opined that while Plaintiff's mental impairments are severe, they are well-controlled with medication, and that Plaintiff has no significant limitations at this time. (*Id.*).

Dr. Hanson completed a Mental Status Evaluation Form on December 6, 2012. (R. 412). She noted that Plaintiff's symptoms are managed with current medications, therapy, and reduced stress. (R. 413). Dr. Hanson found marked functional limitations in restriction of activities of daily living and in difficulties in maintaining social functioning, and moderate functional limitations in difficulties in maintaining concentration, persistence, or pace. (R. 414). She noted no episodes of decompensation within a 12 month period. (*Id.*). Dr. Hanson opined that Plaintiff

has a medically documented history of a chronic organic mental disorder of at least two year duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. (R. 414-415). She added Plaintiff would have difficulty working at a job on a sustained basis because stress has historically derailed him. (R. 415). Dr. Hanson finally opined that Plaintiff has been stable without work stress, but she would be concerned about the cumulative stress and effects of work and decompensation. (R. 416).

## Proceedings before the ALJ

At the hearing before the ALJ, Plaintiff testified that when he was laid off from his job in 2011, "everything broke loose"; he experienced mental problems including rage, depression, and suicidal thoughts. (R. 36). Regarding his diagnosis of Dissociative Identity Disorder, Plaintiff explained he had the symptoms prior to the diagnosis, including having daydreams of doing other things that did not make sense. (R. 39). He added that therapy keeps his symptoms under control. (*Id.*). Plaintiff testified that he has given great thought to trying to find another job, but "can't even think about doing a job because [he is] afraid of people." (R. 42). Plaintiff stated he volunteers at a shelter working with abused animals for four hours per week. (R. 42-43). His long term plan is to try to go back to work. (R. 43).

The ALJ received testimony from a Vocational Expert. In response to the hypothetical of whether jobs were available for an individual the same age, education, and work experience as Plaintiff, who was limited to performing simple, routine tasks in a stable work environment with no public contact and superficial, brief interaction with coworkers and supervisors, the

Vocational Expert testified that the jobs of systems monitor, retail marker, and material handler were available. (R. 44-45). The ALJ added that he would not pose a hypothetical based on Dr. Hanson's opinion because, if her opinion is well-supported, Plaintiff has a listing-level impairment. (R. 46). The Vocational Expert further testified that his testimony was consistent with the Dictionary of Occupational Titles. (R.46).

## The ALJ's Decision

The ALJ applied the established five-step, sequential evaluation test for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). Step one determines whether the claimant is engaged in "substantial gainful activity." If he is, disability benefits are denied. 20 C.F.R. § 404.1520(b). Here, the ALJ determined that Plaintiff did not engage in substantial gainful activity since the alleged onset date. (R. 17).

At step two, the ALJ evaluates whether the claimant has a medically severe impairment or combination of impairments. In this case, the ALJ determined that Plaintiff has the following severe impairments: Bipolar Disorder, Dissociative Identity Disorder, Post-Traumatic Stress Disorder, and Sex Addiction. (R. 17).

At the third step, the ALJ evaluates the claimant's impairments against the list of those impairments that the Social Security Administration acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d), 20 C.F.R. Part 404, Subpart P, App. 1 (2010) (hereinafter "the Listings"). If the impairments meet or medically equal one of the Listings, the claimant is conclusively presumed to be disabled. In this case, the ALJ considered Plaintiff's impairments, alone and in combination, and concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listings. (R. 18-19).

At step four, the ALJ must first assess the claimant's residual functional capacity ("RFC") and then determine whether the claimant can perform past relevant work. 20 C.F.R. § 404.1520(f). Here, after considering the record as a whole, the ALJ found that Plaintiff has the RFC to perform a full range of work at all exertion levels but with the following nonexertional limitations: Plaintiff retains the ability to understand, remember, and carry out simple, routine tasks in a stable work environment, without public contact and with no more than brief, superficial interaction with supervisors and coworkers. (R. 20). The ALJ then determined that Plaintiff was unable to perform his past relevant work. (R. 24).

Finally, at step five, the ALJ must determine, considering the claimant's age, education, work experience, and residual functional capacity, whether there are jobs existing in significant numbers in the national economy claimant can perform. 20 C.F.R. § 404.1569. In this case, the ALJ heard testimony from a vocational expert and concluded that the jobs of systems monitor, retail marker, and material handler are available. (R. 32). As such, the ALJ determined that Plaintiff was not under a disability through the date of the decision. (R. 25).

## Standard of Review

Under 42 U.S.C. § 405(g), the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Judicial review of the Commissioner's decision is limited. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). It is not the Court's function to determine *de novo* whether the claimant was disabled. *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court must review the record to determine first whether the correct legal standard was applied and then whether the record contains substantial evidence to support the decision of the Commissioner. *See* 42 U.S.C. § 405(g) ("The findings of

the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."); *see also Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir. 1998); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

When determining whether the Commissioner's decision is supported by substantial evidence, the Court must consider the entire record, examining the evidence from both sides. *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). Substantial evidence need not compel the Commissioner's decision; rather, substantial evidence need only be that evidence that "a reasonable mind might accept as adequate to support [the] conclusion" being challenged. *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (internal quotation marks and citations omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks and citation omitted).

## **Discussion**

In support of his appeal, Plaintiff argues that the ALJ improperly evaluated the medical opinions of record in violation of the treating physician rule. The Court agrees.

Under what is commonly referred to as the treating physician rule, "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)" is given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician is accorded extra weight because of the continuity of the treatment that he or she provides, and the doctor-patient relationship places him or her in a unique position to make a complete and accurate diagnosis of

the patient. *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983). However, the opinion of a treating physician will not be afforded controlling weight if that opinion is not consistent with other substantial evidence in the record, including the opinions of other medical experts. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); 20 C.F.R. § 404.1527(c)(2). Additionally, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative," as that is a determination reserved for the Commissioner. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1527(d)(1).

An ALJ who does not accord controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(c). Among those factors are: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id.*; *Halloran*, 362 F.3d at 33. The regulations also require the ALJ to "give good reasons" for the weight he affords to a treating source's opinion. *See* 20 C.F.R. § 404.1527(c)(2); *see also Schaal v. Apfel*, 134 F.3d 496, 503-04 (2d Cir. 1998). Additionally, an ALJ may not reject a treating source's opinion without first trying to fill any clear gaps in the administrative record. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1978).

Here, Plaintiff argues that if the ALJ found Dr. Creekmore's records to be incomplete, he has an affirmative duty to further develop the record. The Commissioner responds that the regulations no longer specifically require an ALJ to recontact a treating source, and that Plaintiff

ultimately had the burden of providing evidence in support of his disability. The ALJ gave little weight to the opinion of Dr. Creekmore because her treatment summaries were not accompanied by detailed treatment notes and mental status exams, and because her opinion was inconsistent with the other evidence of record. An ALJ may not dismiss a treating source's opinion without trying to fill clear gaps in the claimant's medical records. *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011). When the administrative record is deficient, "an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Id.*

Effective March 26, 2012, the Commissioner amended 20 C.F.R. § 404.1512 to remove subsection (e)'s requirements relating to the ALJ's duty to recontact medical sources when the report contains a conflict or ambiguity that must be resolved, does not contain all of the necessary information, or does not appear to be based on acceptable diagnostic techniques. This amendment did not, however, "give the ALJ license to ignore gaps or inconsistencies in the record." *Stroud v. Comm'r of Soc. Sec. Admin.*, No. 13 CIV. 3251 AT JCF, 2015 WL 2114578, at *3 (S.D.N.Y. Mar. 24, 2015). Rather, the amendment modified the requirement "to recontact your medical source(s) first when we need to resolve an inconsistency or insufficiency in the evidence he or she provided. Depending on the nature of the inconsistency or insufficiency, *there may be other, more appropriate sources from whom we could obtain the information we need.*" *Id.* (citing *How We Collect and Consider Evidence of Disability*, 77 Fed.Reg. 10651–01 (Feb. 23, 2013) (emphasis added). The amendment was meant to give ALJs "more flexibility in determining *how best to obtain this information,* [so that they] will be able to make a determination or decision on disability claims more quickly and efficiently in certain situations." *Id.*, (citing *How We Collect and Consider Evidence of Disability*) (emphasis added). The new

14

regulation does not, however, "alter the ALJ's duty to resolve inconsistencies in a medical source's evidence." *Stroud* at *3.

Here, the ALJ obviously felt that the lack of Dr. Creekmore's treatment notes impacted his ability to fully credit her opinion. The ALJ may not rely on this rationale without also requiring him to seek out the information he felt was missing.[4] In the spirit of honoring the requirement that the ALJ must help to develop the record fully and fairly, the Court finds that the ALJ erred in discrediting Dr. Creekmore's opinion for not being support by detailed treatment notes without seeking such notes from her.

The ALJ also gave little weight to the opinion of Dr. Hanson, finding that it was inconsistent with her own treatment notes and record evidence showing Plaintiff has a higher level of functioning than indicated in her correspondence and in the Mental Status Evaluation Form she completed. Dr. Hanson opined that Plaintiff was stable at present, but that the stress associated with working could lead to decompensation. (R. 416). She also opined that Plaintiff's symptoms were managed with current medications, therapy, *and reduced stress*. (R. 413) (emphasis added).

The ALJ needed to "give good reasons" for the weight he afforded to Dr. Hanson's opinion. *See* 20 C.F.R. § 404.1527(c)(2). He failed to do so here. The ALJ summarily stated that Dr. Hanson's opinion was inconsistent with the record evidence, but did not provide an adequate explanation. Dr. Hanson stated that Plaintiff's symptoms were managed with reduced

---

[4] The Court also points out that the Social Security Administration issues a fact sheet for mental health professionals addressing how they may support individuals' social security disability claims while abiding by relevant privacy laws. The fact sheet instructs that mental health professionals may "prepare a special report detailing the critical current and longitudinal aspects of your patient's treatment and their functional status." *See A Fact Sheet for Mental Health Care Professionals: Supporting Individuals' Social Security Disability Claims*, found at http://www.ssa.gov/disability/professionals/mentalhealthproffacts.htm#footnote6. It seems patently unfair for the ALJ to discredit Dr. Creekmore's opinion on the basis that she did something the Social Security Administration recommends as proper.

stress; this opinion was premised on the supposition that Plaintiff's level of function is what it is because he does not currently have the added stresses a job would produce.  The Court finds this to be consistent with her treatment summaries.  For example, in her April 20, 2012 report, Dr. Hanson noted that Plaintiff had "downsized his life in order to make it more manageable."  (R. 396).  She further noted that because of this increased stability, Plaintiff was able to volunteer at an animal shelter.  (*Id.*).  Likewise, Dr. Hanson's October 25, 2012 report observed that the stressors in Plaintiff's life are dramatically reduced without the demands and criticism that derailed him in the work environment.  (R. 408).  She further noted that Plaintiff is at risk of decompensating if demands or stressors exceed his resources or capacity to manage.  (*Id.*).  These notes are, in fact, consistent with the opinion that Plaintiff was stable at present, but that if he resumed working, the stress associated with having a job could lead to decompensation.

Any inconsistencies with this opinion and the medical evidence of record that the ALJ found are not apparent to the Court, and were not adequately explained in the ALJ's decision.  As such, it cannot be said that the ALJ gave "good reasons" for discounting Dr. Hanson's opinion.  *See Gunter v. Commissioner of Soc. Sec.*, 361 Fed.Appx. 197, 199-200 (2d Cir.2012) (finding error when the ALJ failed to adequately explain the decision not to credit the opinion of a treating course, and finding that the mere remark that the treating source's opinion was inconsistent with the evidence of record did not constitute good reasons for discrediting the treating source's opinion).

The Commissioner also argues that Drs. Creekmore's and Hanson's opinions that Plaintiff was unable to work and was disabled were not binding on the ALJ as the determination as to whether an individual is disabled is reserved to the Commissioner.  It is true that the final disability determination is one for the Commissioner to make.  *See Snell v. Apfel*, 177 F.3d 128,

16

133-34 (2d Cir. 1999). "But it does not follow that the ALJ is thus relieved of [his] obligation to provide good reasons for rejecting the medical source's opinion…" *Geraw v. Commissioner of Soc. Sec.*, No. 2:11-cv-32, 2011 WL 6415475, at *5 (D. Vt. Dec. 21, 2011).

In discounting the opinions of Plaintiff's treating sources, the ALJ adopted the opinions of the state agency psychological consultants because he found they were supported by and consistent with the substantial evidence of record. When a treating source's opinion is not given controlling weight, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant…" 20 C.F.R. § 404.1527(e)(2)(ii). Here, the ALJ failed to do this; he merely summarily stated he would adopt the opinions. Even more, the state agency psychologists did not have all of the relevant medical evidence at the time of their consultation. Specifically, they did not have the most recent records of Dr. Creekmore, including her November 5, 2012 and December 2, 2012 summaries, or Dr. Hanson's reports including the April 20, 2012 and October 25, 2012 reports, and the December 6, 2012 Mental Impairment Questionnaire she completed. When a medical opinion is not based on all evidence in the record, it is not entitled to substantial weight. *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011)(finding the ALJ erred in placing substantial weight on a nonexamining source's opinion when it was unclear whether that source reviewed all of the relevant medical information); *Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995) (holding that findings of nonexamining medical consultants did not constitute substantial evidence supporting the ALJ's decision when they were not based upon the full record, including not encompassing medical records from after the date of the consultants' reports). It was error for the ALJ to give the opinions of the state agency psychologists controlling weight in this context. [5]

---

[5] It is also worth noting that ALJ failed to acknowledge that the state agency psychologists did not examine Plaintiff and instead relied only on the evidence of record. This is

In all, the ALJ's failure to develop the record, consider the relevant factors, and sufficiently explain the weight afforded to the medical opinions of record constitutes legal error and requires remand of this matter.  *See Duell v. Astrue*, No. 8:08-CV-969, 2010 WL 87298, at *5 (N.D.N.Y. Jan. 5, 2010).  On remand, the ALJ must gather additional information that might be necessary to enable him to clearly explain how the medical evidence, including opinion evidence, supports the RFC assessment.  In so doing, the ALJ should take care to consider the relevant factors for weighing medical opinions, and to support his weight determinations with clear references to the administrative record.  In addition, the Court recommends that the ALJ should, in his new decision, consider the remaining issues Plaintiff raises in this appeal in order to obviate the need for repeated judicial review.

## Conclusion

For the reasons discussed above, the Court recommends that Plaintiff's motion to reverse the decision of the Commissioner and/or remand [Doc. # 13] should be GRANTED, and Defendant's motion to affirm the decision of the Commissioner [Doc. # 16] should be DENIED.  This matter should be remanded to the ALJ for further proceedings in accordance with this opinion.

This is a Recommended Ruling.  *See* Fed. R. Civ. P. 72(b)(1).  Any objection to this Recommended Ruling must be filed within 14 days after service.  *See* Fed. R. Civ. P. 72(b)(2).  In accordance with the Standing Order of Referral for Appeals of Social Security Administration Decisions dated September 30, 2011, the Clerk is directed to transfer this case to a District Judge

---

in stark contrast to Drs. Creekmore and Hanson, who met with Plaintiff frequently over extended periods of time.  As such, the ALJ "should have at least acknowledged this difference and considered its effect on the comparable weight of the medical opinions." *Johnston v. Colvin*, No. 3:13-CV-00073 JCH, 2014 WL 1304715, at *32-33 (D. Conn. Mar. 31, 2014) (citation omitted) *report and recommendation adopted*, 1:11–CV–12–JGM, 2011 WL 4915740 (D.Vt. Oct. 17, 2011)).

for review of the Recommended Ruling and any objections thereto, and acceptance, rejection, or modification of the Recommended Ruling in whole or in part. *See* Fed. R. Civ. P. 72(b)(3) and D. Conn. Local Rule 72.1(C)(1) for Magistrate Judges.

The Clerk's Office is further instructed that, if any party appeals to this Court the decision made after remand, any subsequent Social Security appeal is to be assigned to the Magistrate Judge who issued the Recommended Ruling in this case, and then to the District Judge who issued the Ruling that remanded the case.

SO ORDERED, this   14th   day of May, 2015, at Bridgeport, Connecticut.

> *  /s/ William I. Garfinkel*
> WILLIAM I. GARFINKEL
> United States Magistrate Judge